

JUL 3 1 2008

ORDERED in the Southern District of Florida on_____

A. Jay Cristol, Chief Judge Emeritus
United States Bankruptcy Court

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
### Miami Division
### www.flsb.uscourts.gov

IN RE:                                                CHAPTER 13

ROBERT WEISER & SILVIA WEISER,                        CASE NO.
                                                      08-13484-BKC-AJC
                    DEBTORS.
_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW
## ON OBJECTIONS TO CONFIRMATION OF DEBTORS'
## CHAPTER 13 PLAN AND MOTION TO VALUE COLLATERAL

**THIS MATTER** came before the Court for hearing on June 16 and 18, 2008 on

Objections to Confirmation (C.P. #22) and Motion to Value Collateral (C.P. #27) filed by Branch

Banking and Trust Company ("BB&T"), United Community Bank ("UCB") and First Charter

Bank. The lenders' principal objections to confirmation are lack of eligibility for Chapter 13

relief and lack of good faith.[1] The valuation motion seeks to determine the unsecured portions of

the lenders' secured claims. Upon considering the testimony and other evidence presented at the

hearing, and hearing argument of counsel, the Court makes the following findings of fact and

conclusions of law.

---

[1] The lenders raised several other confirmation objections in their filing but did not
pursue them further at the hearing. Because the Court can decide this matter based on the
eligibility and good faith issues, the Court will not address the other confirmation objections.

CASE NO. 08-13484-BKC-AJC

## FINDINGS OF FACT

Debtors filed their joint Voluntary Chapter 13 Petition and Chapter 13 Plan on March 25, 2008.  Based on their Schedules, the Debtors have less than $5,000 in general unsecured debt. The remaining unsecured debt consists of the unsecured portions of the claims of several lenders who made loans to the Debtors to enable them to purchase six undeveloped lots in Mitchell County, North Carolina.  The movants, BB&T, UCB and First Charter, are three of the four North Carolina lenders.  A fourth lender, SunTrust, did not file objections to confirmation.

In 2003, Silvia Weiser, individually, purchased two lots financed with a loan from BB&T.  In 2004, Robert Weiser, individually, purchased a single lot, also financed by BB&T, and the Weisers, together, purchased three additional lots, financed by three separate lenders, UCB, First Charter and SunTrust.  The loans are summarized as follows[2]:

|  | BB&T (1) | BB&T (2) | UCB | First Charter | SunTrust |
|---|---|---|---|---|---|
| Borrower | Silvia Weiser | Robert Weiser | Weisers | Weisers | Weisers |
| Loan Amount | $125,000 | $100,000 | $100,000 | $100,000 | $100,000 |
| Down Payment | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 |
| Date of Loan | 6/30/03 | 10/28/04 | 11/11/04 | 11/30/04 | 11/1/04 |
| Balance Due[3] | $103,941.45 | $90,095.87 | $95,518.72 | $97,626.11 | $100,525.63 |
| Value | $40,000 | $20,000 | $20,000 | $20,000 | $20,000 |
| Deficiency | $63,941.45 | $70,095.87 | $75,518.72 | $77,626.11 | $80,525.63 |
| Term | 5 years | 5 years | 5 years | 5 years | 5 years |
| Lot Number | Lots 75&76 | Lot 72 | Lot 40 | Lot 70 | Lot 69 |

---

[2] This information is derived primarily from the Debtors' Schedules and the loan documents introduced into evidence.  Some of the information concerning the SunTrust loan is derived from its Proof of Claim (Claim No. 7).

[3] The loan balance amounts set forth in the various lenders' Proofs of Claim are higher than the amounts scheduled by the Debtors.  They are as follows:  BB&T (1): $109,430.02; BB&T (2): $96,520.95; UCB: $105,605.24; First Charter: $104,544.10; SunTrust: $100,525.63.

The North Carolina lots were located in a community known as the "Village of Penland," in or near Spruce Pine, North Carolina.  The Weisers purchased lots from MFSL Land Holdings, LLC, an entity affiliated with Peerless Real Estate Services.[4]  Silvia Weiser learned about the opportunity to purchase lots in the Village of Penland from Luis Castillo, a Miami real estate broker who employed Mrs. Weiser as a real estate sales agent for several years.

None of the transactions engaged in by the Weisers involved standard sale contracts. With respect to the first transaction, which took place in June 2003, the seller agreed to pay the $25,000 down payment, to make all of the monthly loan payments and to repurchase the lots from Mrs. Weiser within two years for a purchase price that would be sufficient to satisfy the loan balance.  The seller did not comply with its agreement to repurchase the lots from Mrs. Weiser and did not make the loan payments.  Mrs. Weiser did not make any loan payments herself.  As noted below, the movants' appraiser was unable to locate these lots.

The remaining transactions—the four sales that took place in 2004—all followed the same pattern.  The seller agreed to make the down payments for the Weisers ($25,000 for each of the four lots) and to make all of the note payments after the first six months.  In addition, the seller agreed to pay the Weisers a fee of $32,000 for each of the transactions.  The seller made the down payments and paid the Weisers the up front fees (the Weisers received a total of $128,000 in fees).  During the first year of these loans, after learning that the seller or Peerless was not making the payments for them, the Weisers discontinued making loan payments.

The Weisers purchased all of the North Carolina lots "sight unseen."  They never traveled to North Carolina to see the lots or the community, and, prior to closing on the sales, did not

---

[4] Several individuals associated with Peerless are the subject of a pending federal indictment in North Carolina for mortgage fraud.

even see pictures of the lots or obtain descriptions of them. The closings were conducted by mail. Mrs. Weiser received a deed for the two lots she purchased in 2003. However, the Weisers neither received nor requested deeds or title policies for the lots purchased in 2004.

The Weisers testified that they entered into the transactions because they trusted Luis Castillo, a neighbor who they had known for approximately three years. Castillo is a real estate broker, and Mrs. Weiser, who is a licensed real estate sales agent, was associated with Castillo's office.

Both of the Weisers are licensed real estate agents. Mrs. Weiser worked as a real estate agent from 2000, when she was licensed, until recently. She is also a licensed mortgage broker but is now working as a licensed public adjuster. Mr. Weiser is employed as a code enforcement officer for Miami-Dade County. The Weisers are both college educated.

The Weisers have purchased numerous properties for investment, in the Miami area, where they reside, and in other locations in Florida, including Port Charlotte and Bonita Springs. All of these transactions were standard sales transactions. The Weisers inspected the properties prior to closing, made the down payments and received deeds and title policies. None of these transactions (there were approximately 10 Florida properties) involved repurchase agreements or arrangements whereby the sellers agreed to make loan payments. None of these transactions involved the Weisers' receipt of up front fees.

While there are several features of the North Carolina loan transactions that are highly unusual, the Court places particular weight on the fact that, with respect to the four lots purchased in 2004, the sellers were making the 20% down payments of $25,000 per lot and were paying the Weisers fees of $32,000 per lot. These facts were not disclosed to the lenders.

- 4 -

The bank representatives testified that the banks viewed the transactions as normal lot sales. The banks understood that the Weisers had inspected the lots and were investing their own money in the lots as part of the purchase price. None of the banks were aware that the Weisers were being paid up front fees, that the sellers were making the down payments, that the sellers had agreed to make most of the note payments (in the case of the two lots purchased in 2003—all of the note payments) or that the sellers had agreed to repurchase some of the lots from the Weisers. The bank representatives testified that the banks would not have made the loans if they had known any of these facts.[5]

The bank representatives further testified that the banks, in deciding to make these loans, placed primary reliance, not on the value of the collateral, but on the Weisers' credit and on their ability and willingness to repay the loans. One bank representative explained that the requirement of a down payment was especially important because the bank wanted to know that the Weisers were personally invested in the property.

While the Court is not privy to the bank's underwriting standards, the Court finds the bank representatives' testimony on these matters to be credible. Certainly, several aspects of these transactions, if disclosed to the lenders, would have served as "red flags," alerting the lenders to the possibility that the mortgage loans were fraudulent. For their part, the Weisers admitted that they expected Peerless, the developer, to repay the loans, despite signing promissory notes stating that they would do so themselves.

---

[5] The apparent fraud relating to lot sales in the Village of Penland involved numerous sales and resulted in large losses for several of the lenders. The BB&T and UCB representatives testified that BB&T and UCB each sustained losses of over $20 million as a result of land sales in the Village of Penland.

The Weisers attempted to portray themselves as wholly innocent victims who were duped by Peerless and betrayed by Castillo. However, in view of the Weisers' level of experience and the highly unusual nature of these transactions, the Court does not find this testimony credible. Moreover, the evidence introduced by the lenders indicates that the Weisers misrepresented and concealed material facts from the lenders.[6]

The HUD Settlement Statements, signed by the Weisers and acknowledged by them to be complete and accurate, did not disclose that the sellers were making the down payments or that the Weisers were receiving fees from the sellers. Additionally, in their loan applications for the 2004 loans, the Weisers, while listing several other properties they owned, did not list the two Mitchell County lots that Mrs. Weiser purchased in 2003. Mrs. Weiser attempted to explain this omission as an oversight.[7] The Weisers closed on all four of the 2004 loans within the same two-week period, in November 2004, and used multiple lenders, thereby obscuring the fact that the Weisers were obtaining multiple loans from the North Carolina lenders.

There are a number of other misstatements and omissions in the documents the Weisers submitted to the North Carolina lenders. The sale contracts for the lots were submitted as part of the loan application process. The sale contracts, all of which are on the same standard form, state that the Weisers made "an on-site personal examination" of the properties. This never

---

[6] The Weisers also appear to have misled the IRS. They did not report any of the deposits paid for them by the sellers as income in their federal tax returns, and they initially failed to report their receipt of two of the $32,000 payments. However, they appear to have reported these two payments in an amended tax return for 2004, which they filed in September 2007.

[7] She also testified that certain of the information in one of her credit applications was not accurate and may have been filled in by someone else, such as Luis Castillo. When questioned further about this, she suggested that she may have signed one or more credit applications partially in blank. This conduct strongly suggests that the Weisers were not concerned about the accuracy of the financial information they were providing to the lenders.

occurred. The contracts also contain a standard merger clause. Far from stating all the terms of the sale agreements, the contracts omitted numerous material terms.

Mrs. Weiser provided false information concerning her income in personal financial statements she submitted to at least two of the lenders, BB&T and UCB, and she also falsely stated that she was the sole owner of the couple's Miami residence. In fact, the residence was owned, at all times, by the Weisers, as tenants by the entirety. When questioned about who owned the residence, Mr. Weiser initially stated that it was in his wife's name and then said he was not sure.

Viewing these documents as a whole, the Court finds that the Weisers misled the banks with respect to the nature of the sale transactions, the extent of their borrowing and their financial condition. As a result, loans were made that should not have been made, the Weisers defaulted under the loans, and they now seek to discharge the resulting debts in Chapter 13.

It is clear that the Weisers filed this case for the primary purpose of attempting to discharge their obligations to the North Carolina lenders. They are current with respect to their credit card and other consumer debt, are not facing a foreclosure of their home or other financial emergency and have sufficient monthly income to pay their recurring expenses.

In addition to hearing testimony on the objections to confirmation, the Court also heard testimony in support of the lenders' motion to value the collateral. As previously discussed, the property securing the movants' loans consists of five lots in Mitchell County, North Carolina. The lenders' appraiser, Derby Westbrook, who is well-qualified, testified that the Village of Penland is located near a surface mining operation, where mica is mined, and that a steady hum can be heard from all locations. He also noted that a train track runs through the community, and a train passes through about once an hour on a 24-hour basis. He further testified that, for the

most part, there are no passable roads and that any roads that do exist are gravel and soil. Westbrook noted that none of the lots purchased by the Weisers have utilities.  He described the lots as overgrown, more vertical than horizontal and, in most instances, having poor views.

Westbrook valued Lot 40 at $18,200 and Lots 70 and 72 at $30,000 each, but cautioned that it was difficult to find comparable sales because prior sales in the Village of Penland are not reflective of market value.  He described the market demand for these sites as extremely weak.

Westbrook valued Lots 75 and 76 at zero because he could not locate them.  He explained that there were no stakes or markers, and, after spending four hours traversing the area with a local resident who knows the area well, he could not find these lots.  The Weisers, without having seen these lots (or any of their lots) suggested that the lots exist because they have received tax bills for them.  The Court notes that the receipt of a tax bill does not necessarily prove that a property exists or has been surveyed.  The Weisers did not introduce any evidence that the tax assessor of Mitchell County surveyed the lots or verified their actual existence.

The Debtors did not offer the testimony of an appraiser and did not provide their own opinions of value.  However, Mrs. Weiser testified that the lots are assessed for tax purposes at $17,500.[8]

## CONCLUSIONS OF LAW

### Eligibility for Chapter 13

As a threshold matter, the Debtors do not satisfy the eligibility requirements for Chapter 13 because their noncontingent and liquidated unsecured debts exceed the statutory maximum. This fact alone requires dismissal of this joint Chapter 13 case.  The Debtors filed this

---

[8] She explained that $20,000 was used as the value of each lot in Debtors' Schedule A because, in her experience, actual values are usually slightly higher than tax assessment values.

proceeding as a joint case.  Only joint debtors that owe, on the date of the petition, "noncontingent, liquidated, unsecured debts that aggregate less than $336,900" and "noncontingent, liquidated, secured debts of less than $1,010,650" may be debtors under Chapter 13. *See* 11 U.S.C. § 109(e).

Bankruptcy courts must consider the unsecured portion of a secured claim when determining the Chapter 13 eligibility requirement. *In re Scovis*, 249 F.3d 975, 983 (9th Cir. 2001); *In re Balbus*, 933 F.2d 246, 247-48 (4th Cir. 1991); *In re Buis*, 337 B.R. 243, 248 (Bankr. N.D. Fla. 2006).  Debtors list their general unsecured debt as $4,756.00 but list the unsecured portions of their secured claims as $367,707.78.  Using these figures, the Debtors' combined total unsecured debt is $372,463.78, an amount that is above the statutory limit.  The total unsecured debt amount would be higher if the Court were to utilize Westbrook's values, including his zero values for two of the lots, or if the Court were to use the debt amounts stated in the lenders' proofs of claim.  However, because even the Debtors' own figures establish their ineligibility, it is not necessary for the Court to decide whether the movants' valuations are overstated or whether the debt amounts scheduled by the Debtors are understated.

Section 109(e) clearly provides that husband and wife debtors filing joint petitions are limited to $336,900 in total unsecured debt.  Specifically, Section 109(e) states: "an individual with regular income and such individual's spouse . . . that owe, on the date of the filing of the petition, noncontingent, liquidated, unsecured debts that aggregate less than $336,900 . . . may be a debtor under chapter 13 of this title."

At the outset of the hearing, Debtor's counsel, recognizing this problem, made an *ore tenus* motion to bifurcate this joint case into two separate Chapter 13 cases.  The Court denied this motion as untimely in view of the fact that it was not made until the hearing on the lenders'

objections to confirmation. The Court is not aware of any procedure for bifurcating a joint case absent either an amended filing or the dismissal of the pending case and the filing of two new individual cases.

Based on the fact that the Debtors filed a joint petition, the Court must consider their joint debts. The joint debts exceed the unsecured debt limit whether the Court uses the values listed by the Debtors in their Schedules, the values attributed to the properties by the lenders' appraiser or the tax assessment values. Accordingly, the Court must dismiss this joint case for failure to meet the eligibility requirement.

### Lack of Good Faith

In addition to challenging the Debtors' eligibility for Chapter 13 relief, the lenders also objected to confirmation on the ground of lack of good faith. For the reasons discussed below, the Court concludes that the Debtors' Chapter 13 Plan cannot be confirmed for lack of good faith.

The Bankruptcy Code imposes the requirement of good faith in the proposal and confirmation of a plan. The Bankruptcy Code expressly provides that a Chapter 13 plan may not be confirmed unless "the plan has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1325(a)(3). In enacting this provision, "Congress intended to provide bankruptcy courts with a discretionary means to preserve the bankruptcy process for its intended purpose." *In re Waldron* 785 F.2d 936, 941 (11th Cir. 1986) ("[W]henever a Chapter 13 petition appears to be tainted with a questionable purpose, it is incumbent upon the bankruptcy courts to examine and question the debtor's motives."). A debtor's "good faith" or lack thereof must be determined on a case-by-case basis upon a consideration of the totality of the circumstances. *In re Kitchens*, 702 F.2d 885, 888 (11th Cir. 1983).

In *In re Kitchens*, the Eleventh Circuit identified many factors relevant to assessing good faith (or the lack thereof) in a Chapter 13 case, several of which are applicable here. The primary factors applicable here are "the motivations of the debtor and his sincerity in seeking relief under the provisions of Chapter 13" and "the circumstances under which the debtor has contracted his debts and his demonstrated bona fides, or lack of same, in dealings with his creditors." *Id.* In addition, the Eleventh Circuit also noted that a bankruptcy court should consider, among other factors, the substantiality of the proposed repayments and the dischargeability of the debts. *Id.* at 888-89.

As noted, the Debtors are generally current in payment of their credit card and other consumer debt. They are not facing any lawsuits, foreclosures, repossessions or garnishments. The value of their residence is substantially in excess of the amount of the mortgage, and they appear to be current in home mortgage payments. Their monthly income is in excess of their monthly expenses. But for their defaults under the notes payable to the North Carolina lenders, the Debtors would not have any need for Chapter 13 relief. Accordingly, it is clear that the Debtors' sole motivation in filing this proceeding was to avoid repayment of the North Carolina loans. The Court must evaluate the Debtors' good faith, or lack thereof, from this perspective.

As the Supreme Court recently stated, "the federal courts are virtually unanimous that prepetition bad-faith conduct may cause a forfeiture of any right to proceed with a Chapter 13 case." *Marrama v. Citizens Bank of Massachusetts*, 127 S. Ct. 1105, 1107, 166 L. Ed. 2d 956 (2007). *See also In re Alt*, 305 F.3d 413, 418-19 (6th Cir. 2002); *In re Leavitt*, 171 F.3d 1219, 1224 (9th Cir. 1999); *In re Molitor*, 76 F.3d 218, 220 (8th Cir. 1996); *In re Gier*, 986 F.2d 1326, 1329-30 (10th Cir. 1993); *In re Love*, 957 F.2d 1350, 1355-56 (7th Cir. 1992); *In re Chaffin*, 836

- 11 -

F.2d 215, 216 & n.5 (5th Cir. 1988); *In re Kitchens*, 702 F.2d at 889; *In re Sullivan*, 326 B.R. 204, 211 (1st Cir. BAP 2005).

Here, the Debtors entered into loan transactions that involved material terms that were, at best, not disclosed to the lenders and, at worst, concealed from their lenders.  They presented loan applications supported by sale contracts that appeared to involve ordinary lot purchases. The reality was altogether different.  Not only were the Debtors being paid substantial up front fees for their participation in the transactions, but the sellers agreed to make the down payments and most of the note payments.  In addition, with respect to several of the lots, the sellers agreed to repurchase the lots from the Debtors at a later date.  None of this was disclosed to the lenders. Moreover, the HUD Settlement Statements were false and misleading because they did not disclose that the sellers were making the down payments and also did not disclose that the buyers were receiving fees.

In addition, the Debtors conduct, to wit, using multiple lenders and timing four of the transactions to occur within a two-week period, which effectively prevented the lenders from learning the extent of their activity, is highly suspicious rather than simply coincidental.  Silvia Weiser also made misstatements concerning her income in several of the loan applications.

Further, Mr. Weiser admitted that the Debtors never intended to repay the North Carolina loans from their own funds, and the evidence supports this conclusion.  The Weisers discontinued making payments shortly after learning that Peerless would not live up to its promise to make the payments for them, and Mrs. Weiser failed to make any payments on her 2003 loan because, according to her testimony, the seller had agreed to make all of the note payments for her, in addition to making the down payment.  The incurring of a debt, without the

intention to repay it, will support a finding of fraud for purposes of non-discharge.[9]  *See In re Hall*, 342 B.R. 653, 656 (Bankr. M.D. Fla. 2006); *In re Pupello,* 281 B.R. 763, 766 (Bankr. M.D. Fla. 2002); *In re Haig*, 135 B.R. 698, 699 (Bankr. S.D. Fla. 1991).

The Court does not accept the Debtors' position that they were unwitting pawns in someone else's fraudulent scheme and did not intend to deceive the banks.  But, even if the Debtors did not set out to defraud the banks, they knew or should have known that they were involving themselves in a fraudulent mortgage scheme.  For a fee, they allowed their credit to be used to enable others to obtain loan proceeds under false pretenses.  At the very least, the Debtors acted recklessly in participating in these transactions and in applying for and obtaining the loans.  Such conduct would be sufficient to deny discharge of the debts to the North Carolina lenders.  *See Birmingham Trust National Bank v. Case*, 755 F.2d 1474, 1476 (11th Cir. 1985); *In re Hall*, 342 B.R. at 656 (same); *In re Haig*, 135 B.R. at 699 (same).

The Court has already discussed the Debtors' motivation in seeking Chapter 13 relief, their "lack of bona fides" in dealing with the North Carolina creditors and the nature of the debts and whether they are dischargeable.  The Court concludes that the Debtors' proposed plan payments are *de minimis* in view of the amount of the deficiency claims.  The proposed Chapter 13 plan provides that the Debtors will surrender the North Carolina lots to the banks and pay approximately $18,000 over a five-year period on all unsecured claims, including the unsecured portions of the lenders' claims.  Thus, the Debtors are proposing to pay approximately 5% of the total unsecured debt over five years.  This will result in a cash recovery to each of the North

---

[9] A promise of future action where, at the time the statement was made, the maker had no intent to perform is fraudulent under Florida law.  *Thor Bear, Inc. v. Crocker Mizner Park, Inc.*, 648 So.2d 168 (Fla. 4th DCA 1994).

Carolina lenders of approximately $3,600 per loan (much less if discounted to present value). In view of the minimal and uncertain value of the lots, the Debtors' plan, in the Court's view, provides further support for a finding of bad faith.

Based on the foregoing, and taking into account the totality of the circumstances, as required by *Kitchens*, it is the Court's conclusion that the Debtors have not satisfied the good faith requirement for confirmation of their Chapter 13 Plan. Accordingly, both because they are ineligible for Chapter 13 relief and because they demonstrated a lack of good faith, the Court will sustain the objections to confirmation, deny confirmation and dismiss this Chapter 13 case. The Court will enter a separate order so providing.

###

Submitted by:
Peter H. Levitt, Esq.
Shutts & Bowen LLP
1500 Miami Center
201 South Biscayne Blvd.
Miami, Florida 33131
plevitt@shutts.com
(305) 415-9447

(Attorney Levitt is directed to serve a conformed copy of these Findings of Fact and Conclusions of Law on all required parties and to file a Certificate of Service.)

- 14 -